## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK HARRELL, *on behalf of himself and all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> CENCORA, INC., THE LASH GROUP, LLC, BRISTOL-MYERS SQUIBB COMPANY, and BRISTOL-MYERS SQUIBB PATIENT ASSISTANCE FOUNDATION, INC., <br><br> Defendants. | Case No.: <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Mark Harrell ("Plaintiff") brings this Class Action Complaint on behalf of himself and all others similarly situated, against Defendants, Cencora, Inc. ("Cencora"), The Lash Group, LLC ("Lash Group"), Bristol-Myers Squibb Company and Bristol Myers Squibb Patient Assistance Foundation, Inc. (collectively, "BMS") (all collectively, "Defendants"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to him, which are based on personal knowledge:

### NATURE OF THE ACTION

1.      This class action arises out of Defendants' failure to properly secure, safeguard, transmit, and adequately destroy Plaintiff's and Class Members' sensitive personal identifiable information and protected health information that it had acquired and stored for its business purposes.

2.      This case involves the unauthorized breach of Defendant Cencora's information system announced through a Notice of Data Security Incident letter on May 17, 2024 (the "Notice Letter"), wherein—on or around February 21, 2024—the personal identifiable information ("PII")

and protected health information ("PHI") (collectively, "Private Information"), including names, dates of birth, health diagnosis, and/or medications and prescriptions, of Plaintiff and Class Members was exposed due to a flaw in Defendant Cencora's information systems, which allowed hackers and other bad actors to obtain Plaintiff's and Class Members' Private Information for unsavory and illegal purposes (the "Data Breach").[1]

3.     Among those affected by the Data Breach include both current and former patients of the Lash Group and BMS, whose Private Information was compromised.

4.     Defendant Cencora (formerly known as Amerisource Bergen) is a drug wholesale company and contact research organization that provides drug distribution and consulting services to health care providers.[2]

5.     Defendant Lash Group is a subsidiary of Cencora that connects creators of pharmaceutical products with providers who care for patients.[3]

6.     According to the Notice Letter, Defendant Lash Group manages the patient support and access program on behalf of Defendant BMS. Defendant Lash Group posted a Notice of Data Security Incident on its website.[4]

7.     Defendant BMS facilitates a program that assists eligible patients in receiving its medications free of charge.[5]

8.     Defendant Cencora admits it experienced a cybersecurity incident. Upon information and belief, Plaintiff's and Class Members' Private Information was unlawfully accessed and may have been exfiltrated by a third party.

---

[1] A true and correct copy of the "Notice Letter" is attached hereto as **Exhibit A**.
[2] https://www.cencora.com/what-we-offer (last visited 5/24/24).
[3] https://www.lashgroup.com/who-we-are (last visited 5/24/24).
[4] **Exhibit A**; *see also* Sample Notice Letter, https://www.lashgroup.com/notice (last visited 5/24/24).
[5] https://www.bmspaf.org/#/ (last visited 5/24/24).

9.     The Private Information compromised in the Data Breach included certain personal or protected health information of individuals whose Private Information was maintained by Defendants, including Plaintiff.

10.     Upon information and belief, a wide variety of Private Information was implicated in the breach, including potentially: names, dates of birth, health diagnosis, and/or medications and prescriptions.

11.     The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which it was entrusted for either treatment.

12.     Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendants, and thus Defendants were on notice that failing to take steps necessary to secure Private Information from those risks left that property in a dangerous condition.

13.     Upon information and belief, Defendants breached their duties and obligations by failing, in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiff and Class Members of Defendants' inadequate data security practices; (6) failing to encrypt or adequately encrypt the Private Information; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack, and (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of

foreseeable vulnerabilities and data security incidents.

14.     Defendants through their privacy policy, both expressly and impliedly understood its obligations and promised to safeguard Plaintiff's and Class Members' Private Information. Plaintiff and Class Members relied on these express and implied promises when seeking out Defendant's services.  But for this mutual understanding, Plaintiff and Class Members would not have provided Defendants with their Private Information. Defendants, however, did not meet these reasonable expectations, causing Plaintiff and Class Members to suffer injury.[6]

15.     Defendants disregarded the rights of Plaintiff and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, and/or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff(s) and Class Members with prompt and full notice of the Data Breach.

16.     In addition, Defendants failed to properly monitor the computer network and systems that housed the Private Information. Had they properly monitored their property, they would have discovered the intrusion sooner rather than allowing cybercriminals a period of unimpeded access to the Private Information of Plaintiff and Class Members.

17.     Plaintiff's and Class Members' identities are now at risk because of Defendants' negligent conduct since the Private Information that Defendants collected and maintained is now in the hands of data thieves.

18.     As a result of the Data Breach, Plaintiff and Class Members are now at a current,

---

[6] https://www.cencora.com/global-privacy-statement-overview (last visited 5/24/24).

imminent, and ongoing risk of fraud and identity theft. Plaintiff and Class Members must now and for years into the future closely monitor their medical and financial accounts to guard against identity theft. As a result of Defendants' unreasonable and inadequate data security practices, Plaintiff and Class Members have suffered numerous actual and concrete injuries and damages.

19.     The risk of identity theft is not speculative or hypothetical but is impending and has materialized as there is evidence that the Plaintiff's and Class Members' Private Information was targeted, accessed, has been misused, and disseminated on the Dark Web.

20.     Plaintiff and Class Members must now closely monitor their financial accounts to guard against future identity theft and fraud. Plaintiff and Class Members have heeded such warnings to mitigate against the imminent risk of future identity theft and financial loss. Such mitigation efforts included and will continue to include in the future, among other things: (a) reviewing financial statements; (b) changing passwords; and (c) signing up for credit and identity theft monitoring services. The loss of time and other mitigation costs are tied directly to guarding against the imminent risk of identity theft.

21.     Plaintiff and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (g) deprivation of value of their PII; and (h) the continued risk to their sensitive Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect it collected and maintained.

22.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

23.     Accordingly, Plaintiff brings this action against Defendants seeking redress for its unlawful conduct and asserting claims for: (i) negligence and negligence *per se*, (ii) breach of implied contract, (iii) breach of third-party beneficiary contract (iv) unjust enrichment, and (v) declaratory relief.

24.     Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendants' data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendants, and declaratory relief.

25.     The exposure of one's Private Information to cybercriminals is a bell that cannot be un-rung. Before this Data Breach, Plaintiff's and the Class's Private Information was exactly that—private. Not anymore. Now, their Private Information is forever exposed and unsecure.

## PARTIES

26.     Plaintiff Mark Harrell is an adult individual who is, and at all relevant times has been, a citizen and resident of Florida.

27.     Plaintiff applied for the BMS patient assistance program in or about 2022.

28.     As a patient, he was required to provide his Private Information to Defendants, including among other things, all his contact information, his date of birth, his health information, his insurance information, and his specific medical treatment information.

29.     Plaintiff diligently protects his Private Information, and, among other things, monitors his Private Information and accounts regularly.

30.     As a result, he has taken multiple steps to avoid identity theft, including increasingly reviewing his credit monitoring service, setting up notices and reports and carefully reviewing all his accounts.

31.     As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff monitors his Private Information multiple times a week and has already spent many hours dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities.

32.     Plaintiff suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of Private Information, a form of property that Defendant obtained from Plaintiff; (b) violation of privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud. Upon information and belief, as a result of the Data Breach, Plaintiff has experienced increased amounts of spam email, texts and phones calls.

33.     As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

34.     Plaintiff greatly values his privacy, and would not have provided his Private Information, undertaken the services if he had known that his Private Information would be maintained using inadequate data security systems.

*Defendants*

35.     Defendant Cencora is a Delaware corporation with its principal place of business at 1 West First Avenue Conshohocken, Pennsylvania 19428.

36.     Defendant Lash Group is a Delaware corporation with its principal place of business at 1 West First Avenue Conshohocken, Pennsylvania 19428.

37.     Defendant Bristol-Myers Squibb Company is a Delaware corporation with its principal place of business located at Route 206 & Province Line Road Princeton, New Jersey 08543.

38.     Bristol-Myers Squibb Patient Assistance Foundation, Inc. is a New Jersey corporation with its principal place of business located at Route 206 & Province Line Road Princeton, New Jersey 08543.

## JURISDICTION AND VENUE

39.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of Class Members exceeds 100, some of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

40.     This Court has personal jurisdiction over Defendants because they are Delaware corporations that operate and have their principal place of business in this District and conduct substantial business in this District.

41.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, Defendants are domiciled in this District, maintain Plaintiff's and Class Members' Private Information in this District, and has caused harm to Plaintiff and Class Members in this District.

**FACTUAL BACKGROUND**

A.    **Defendants Knew the Risks of Storing Valuable Private Information and the Foreseeable Harm to Victims**

42.    At all relevant times, Defendants knew they was storing and permitting their employees to use their internal network server to transmit valuable, sensitive Private Information and that, as a result, Defendants' systems would be attractive targets for cybercriminals.

43.    Defendants also knew that any breach of their systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised, as well as intrusion into their highly private health information.

44.    These risks are not merely theoretical; in recent years, numerous high-profile breaches have occurred at businesses such as Equifax, Yahoo, Marriott, Anthem, and many others.

45.    PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as a result of the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[7] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

46.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. According to the ITRC, in 2019, there were 1,473 reported

---

[7] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last visited 5/24/2024).

data breaches in the United States, exposing 164 million sensitive records and 705 million "non-sensitive" records.[8]

47.     In tandem with the increase in data breaches, the rate of identity theft and the resulting losses has also increased over the past few years. For instance, in 2018, 14.4 million people were victims of some form of identity fraud, and 3.3 million people suffered unrecouped losses from identity theft, nearly three times as many as in 2016. And these out-of-pocket losses more than doubled from 2016 to $1.7 billion in 2018.[9]

48.     The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[10]

49.     "Hospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it on easily—making the industry a growing target."[11]

50.     The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendants' patients especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

51.     As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even

---

[8] *Data Breach Reports: 2019 End of Year Report*, IDENTITY THEFT RESOURCE CENTER, at 2, *available at* https://notified.idtheftcenter.org/s/resource#annualReportSection.

[9] Insurance Information Institute, *Facts + Statistics: Identity theft and cybercrime*, available at https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20(1).

[10]         https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/.

[11] *Id.*

seen $60 or $70."[12]  A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[13]

52.     According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.

> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.

> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[14]

53.     The "high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can **sell for up to $1,000 online.**"[15]

---

[12] IDExperts, You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows:  https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[13] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world*, Key findings from The Global State of Information Security® Survey 2015: https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

[14] Experian, Healthcare Data Breach: What to Know About them and What to Do After One: https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[15] https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

54.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[16]

55.     Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

**B.     Defendants Breached their Duties to Protect their Patients' Private Information**

56.     Upon information and belief, Defendants' HIPAA Privacy Policy is provided or made available to every patient both prior to receiving treatment, and upon request.[17]

57.     Defendants agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiffs and Class Members safely, confidentially, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and the Health Insurance Portability and Accountability Act

---

[16] United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/assets/gao-07-737.pdf.
[17] *See* https://www.lashgroup.com/notice-of-privacy-practices (last visited 5/24/2024).

("HIPAA"). Under state and federal law, businesses like Defendants have a duty to protect current and former patients' PII/PHI and to notify them about breaches.

58.     Via its Privacy Policy, Defendants reaffirm—and advertises—their duties to protect patient PII/PHI. Specifically, Defendant Lash Group declares:

> Lash Group respects the confidentiality of your health information and will protect it in a responsible and professional manner. The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") requires us to protect the privacy of your protected health information and to send you this notice. "Protected health information" as defined under HIPAA means information about you that has been collected and maintained that identifies you and that relates to your physical or mental health or condition, the provision of health care to you, or payment for health care provided to you.
>
> This Notice describes how Lash Group may use and disclose your health information for treatment, payment or health care operational purposes, and it describes how Lash Group may use and disclose your health information for other purposes that are permitted or required by law.[18]

59.     The Private Information held by Defendants in their computer system and network included the highly sensitive Private Information of Plaintiff and Class Members.

60.     On or around February 21, 2024, Defendant Cencora became aware of a ransomware attack on its system.

61.     The Data Breach occurred as a direct result of Defendants' failure to implement and follow basic security procedures, and their failure to follow their own policies, in order to protect their patients' Private Information.

---

[18] *Id.*

62.     On May 17, 2024, Defendant Cencora sent the Notice Letter about the attack to Plaintiff and Class Members. Defendant Cencora updated the Securities and Exchange Commission about the Data Breach on February 21, 2024.[19]

63.     Plaintiff and Class Members have not yet received notice from Defendant regarding the Data Breach.

**C.     Plaintiff and Class Members Suffered Damages**

64.     For the reasons mentioned above, Defendants' conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways. Plaintiff and Class Members must immediately devote time, energy, and money to: 1) closely monitor their medical statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

65.     Once PII or PHI is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendants' conduct. Further, the value of Plaintiff's and Class Members' Private Information has been diminished by its exposure in the Data Breach.

66.     As a result of Defendants' failures, Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of Private Information.

---

[19] https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/1140859/000110465924028288/tm247267d1_8k.htm (last visited 05/24/2024).

67.     From a recent study, 28% of consumers affected by a data breach become victims of identity fraud – this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[20]

68.     With respect to health care breaches, another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[21]

69.     "Actors buying and selling Private Information from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[22]

70.     The reality is that cybercriminals seek nefarious outcomes from a data breach" and "stolen health data can be used to carry out a variety of crimes."[23]

71.     Health information in particular is likely to be used in detrimental ways – by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[24]

72.     "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft.

---

[20] https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud.
[21]     https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.
[22] Id.
[23] https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.
[24] Id.

Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[25]

73.     Plaintiff and the Class Members have also been injured by Defendants' unauthorized disclosure of their confidential and private medical records and PHI.

74.     Plaintiff and Class Members are also at a continued risk because their information remains in Defendants' systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendants fails to undertake the necessary and appropriate security and training measures to protect its patients' Private Information.

## COMMON INJURIES AND DAMAGES

75.     As result of Defendants' ineffective and inadequate data security practices, Plaintiff and Class Members now face a present and ongoing risk of fraud and identity theft.

76.     Due to the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including but not limited to: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; and (i) the continued risk to their Private Information, which remains in Defendants' possession, and which is subject to further breaches, so long as Defendants fails to

---

[25]     https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

**A.     The Risk of Identity Theft to Plaintiff and Class Members is Present and Ongoing**

77.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

78.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

79.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

80.     The dark web is an unindexed layer of the internet that requires special software or authentication to access.[26] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web

---

[26] *What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[27] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

81.     A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here.[28] The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[29] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[30]

82.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your

---

[27] *Id.*

[28] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[29] *Id.; What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[30] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[31]

83.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

84.    Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[32]

85.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[33]

---

[31] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

[32] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[33] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.

86.     Theft of PHI, in particular, is gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[34]

87.     One such example of criminals using PHI for profit is the development of "Fullz" packages. Cyber-criminals can cross-reference two sources of PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

88.     The development of "Fullz" packages means that stolen PHI from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and Class Members' stolen PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

89.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that

---

[34] *See* Federal Trade Commission, Medical Identity Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.

year, resulting in more than $3.5 billion in losses to individuals and business victims.[35]

90.     Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[36] Defendants did not rapidly report to Plaintiffs and the Class that their Private Information had been stolen.

91.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

92.     In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

93.     Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PHI. To protect themselves, Plaintiff and Class Members will need to remain vigilant against unauthorized data use for years or even decades to come.

94.     The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially

---

[35] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.
[36] *Id.*

valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[37]

95.     The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[38]

96.     According to the FTC, unauthorized PHI disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.[39]

97.     Defendants' failure to notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

---

[37] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

[38] *See generally* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[39] *See, e.g.*, https://www.ftc.gov/news-events/news/press-releases/2016/07/commission-finds-labmd-liable-unfair-data-security-practices.

**B.    Loss of Time to Mitigate the Risk of Identify Theft and Fraud**

98.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

99.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

100.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[40]

---

[40]    "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php.



101.    In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[41] Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[42]

---

[41] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[42] *See* https://www.identitytheft.gov/Steps.

**C.     Diminution of Value of the Private Information**

102.    PII/PHI is a valuable property right.[43] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

103.    For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

104.    Private Information can sell for as much as $363 per record according to the Infosec Institute.[44]

105.    Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data was selling on the dark web for $50 and up.[45]

106.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[46] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data

---

[43] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[44] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[45] https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content.

[46] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

broker who in turn aggregates the information and provides it to marketers or app developers.[47, 48] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[49]

107.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and potential release onto the Dark Web, where it may soon be available and holds significant value for the threat actors.

**D.    Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary**

108.    To date, Defendants have done little to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach.

109.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

110.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's

---

[47] https://datacoup.com/.
[48] https://digi.me/what-is-digime/.
[49] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

authentic tax return is rejected.

111.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[50] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

112.    Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

113.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

**E.    Loss of Benefit of the Bargain**

114.    Furthermore, Defendants' poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to provide their Private Information, which was a condition precedent to obtain Defendants' services, Plaintiff as a consumer understands and expected that he was, in part, paying for services and data security to protect the Private Information required to be collected from him.

115.    In fact, Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what he reasonably

---

[50] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

expected to receive under the bargains struck with Defendants.

**F.    Injunctive Relief is Necessary to Protect Against Future Data Breaches**

116.    Moreover, Plaintiff and Class Members have an interest in ensuring that Private Information, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

117.    Because of Defendants' failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses and lost time. Also, he suffered or are at an increased risk of suffering:

      a.    loss of the opportunity to control how their Private Information is used;

      b.    diminution in value of their Private Information;

      c.    compromise and continuing publication of their Private Information;

      d.    out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

      e.    lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

      f.    delay in receipt of tax refund monies;

      g.    unauthorized use of their stolen Private Information; and

      h.    continued risk to their Private Information —which remains in Defendants' possession—and is thus as risk for futures breaches so long as Defendants fail to take appropriate measures to protect the Private Information.

G.     **Lack of Compensation**

118.    Defendant Cencora's credit monitoring offer fails to sufficiently compensate victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiff's and Class Members' Private Information, out of pocket costs, and the time they are required to spend attempting to mitigate their injuries.

119.    Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

120.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft.

121.    Further, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach and face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

122.    Specifically, many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

         a.      Finding fraudulent charges;

         b.      Canceling and reissuing credit and debit cards;

c.  Purchasing credit monitoring and identity theft prevention;

d.  Monitoring their medical records for fraudulent charges and data;

e.  Addressing their inability to withdraw funds linked to compromised accounts;

f.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g.  Placing "freezes" and "alerts" with credit reporting agencies;

h.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i.  Contacting financial institutions and closing or modifying financial accounts;

j.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k.  Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l.  Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

123.  In addition, Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the property of loss of value damages in related cases.

124.  Plaintiff and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to

privacy whatsoever.

125.   Defendant Cencora's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of Private Information. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft. Here, Defendant Cencora knew of the breach and failed to timely notify victims. Defendants have yet to offer an explanation for the delay. This delay violates HIPAA and other notification requirements and increases the injuries to Plaintiff(s) and Class.

## CLASS ALLEGATIONS

126.   Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following class:

> All individuals in the United States whose Private Information was compromised in the Data Breach.

127.   Excluded from the Class is Defendants, their subsidiaries and affiliates, their officers, directors and members of their immediate families and any entity in which Defendants have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

128.   Plaintiff reserves the right to modify or amend the definition of the proposed Class prior to moving for class certification.

129.   **Numerosity.**   The class described above is so numerous that joinder of all individual members in one action would be impracticable.  The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of the individual members thereof are

ascertainable through Defendants' records, including but not limited to, the files implicated in the Data Breach.

130.   **Commonality.**   This action involves questions of law and fact that are common to the Class Members. Such common questions include, but are not limited to:

a.       Whether Defendants had a duty to protect the Private Information of Plaintiff and Class Members;

b.       Whether Defendants had a duty to maintain the confidentiality of Plaintiff and Class Members' Private Information;

c.       Whether Defendants breached their its obligation to maintain Plaintiff and the Class Members' medical information in confidence;

d.       Whether Defendants were negligent in collecting, storing and safeguarding Plaintiff's and Class Members' Private Information, and breached their duties thereby;

e.       Whether Plaintiff and Class Members are entitled to damages as a result of Defendants' wrongful conduct;

f.       Whether Plaintiff and Class Members are entitled to restitution or disgorgement as a result of Defendants' wrongful conduct; and

g.       Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

131.   **Typicality**.   Plaintiff's claims are typical of the claims of the Class Members.   The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same failure by Defendants to safeguard Private Information.   Plaintiff and Class Members were all patients of Defendants, each having their Private Information obtained by an unauthorized third party.

132.     **Adequacy of Representation.**  Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class Members he seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed.  Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

133.     **Predominance.**  Common questions of law and fact predominate over any questions affecting only individual Class Members. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendants breached their common law and statutory duties to secure Private Information on its network server, then Plaintiff and each Class Member suffered damages from the exposure of sensitive Private Information in the Data Breach.

134.     **Superiority.** Given the relatively low amount recoverable by each Class Member, the expenses of individual litigation are insufficient to support or justify individual suits, making this action superior to individual actions.

135.     **Manageability.** The precise size of the Class is unknown without the disclosure of Defendants' records.  The claims of Plaintiff and the Class Members are substantially identical as explained above. Certifying the case as a class action will centralize these substantially identical claims in a single proceeding and adjudicating these substantially identical claims at one time is the most manageable litigation method available to Plaintiff and the Class.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE AND NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class against Defendants)**

136.    Plaintiff restates and realleges all proceeding allegations above as if fully set forth herein.

137.    Defendants owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, transmitting, and protecting their Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

138.    Defendants' duty to use reasonable care arose from several sources, including but not limited to those described below.

139.    Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendants. By collecting and storing Private Information that is routinely targeted by criminals for unauthorized access, Defendants were obligated to act with reasonable care to protect against these foreseeable threats.

140.    Defendant's duty also arose from Defendant's position as a pharmaceutical manufacturer and seller. Defendant holds itself out as a trusted provider of treatment and thereby assumes a duty to reasonably protect its patients' information.  Indeed, Defendants, as direct treatment providers, were in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

141.    Defendants breached the duties owed to Plaintiff and Class Members and thus were negligent. Defendants breached these duties by, among other things: (a) mismanaging their systems and failing to identify reasonably foreseeable internal and external risks to the security,

confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of Private Information; (b) mishandling their data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; and (g) failing to follow its own privacy policies and practices published to its patients.

142.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, their Private Information would not have been compromised.

143.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendants or failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendants' duty.

144.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect the Private Information and not complying with the industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of a data breach involving the Private Information of its patients.

145.    Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

146.    Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

147.    The harm that has occurred as a result of Defendants' conduct is the type of harm that the FTC Act was intended to guard against.

148.    Defendants violated their own policies not to use or disclose PHI without written authorization.

149.    Defendants violated their own policies by actively disclosing Plaintiff's and the Class Members' PHI; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI; failing to maintain the confidentiality of Plaintiff's and the Class Members' records; and by failing to provide timely notice of the breach of PHI to Plaintiff and the Class.

150.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered injuries, including:

    a.    Theft of their Private Information;

    b.    Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

    c.    Costs associated with purchasing credit monitoring and identity theft protection services;

    d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

    e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Defendant Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection

services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.      The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.      Damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.      Continued risk of exposure to hackers and thieves of their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i.      Loss of their privacy and confidentiality in their PHI;

j.      The erosion of the essential and confidential relationship between Defendants—as pharmaceutical manufacturers and sellers—and Plaintiff and Class Members as patients; and

k.      Loss of personal time spent carefully reviewing statements from health insurers and providers to check for charges for services not received.

151.   As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class against Defendants Lash Group and BMS)**

152.    Plaintiff restates and incorporates by reference herein all the allegations contained in paragraphs 1 through 135.

153.    This count is brough against Defendants Lash Group and BMS (for purposes of this count, "Defendants").

154.    When Plaintiff and members of the Class provided their personal information to Defendants, Plaintiff and members of the Class entered into implied contracts with Defendants pursuant to which Defendants agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and Class Members that their data had been breached and compromised.

155.    Defendants required Plaintiff and Class Members to provide and entrust their Private Information and financial information as a condition of obtaining Defendants' services.

156.    Plaintiff and Class Members would not have provided and entrusted their Private Information and financial information to Defendants in the absence of the implied contract between them and Defendant.

157.    Plaintiff and members of the Class fully performed their obligations under the implied contracts with Defendants.

158.    Defendants breached the implied contracts they made with Plaintiff and Class Members by failing to safeguard and protect the Private Information of Plaintiff and members of the Class and by failing to provide timely notice to them that their personal information was compromised in and as a result of the Data Breach.

159.    As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiff and the Class against Defendant Cencora)**

160.    Plaintiff restates and incorporates by reference herein all the allegations contained in paragraphs 1 through 135.

161.    This count is brought solely against Defendant Cencora (for purposes of this count "Defendant").

162.    Upon information and belief, Defendant entered into virtually identical contracts with its clients to provide treatment and/or services, which included data security practices, procedures, and protocols sufficient to safeguard the Private Information that was to be entrusted to it.

163.    Such contracts were made expressly for the benefit of Plaintiff and the Class, as it was their Private Information that Defendant agreed to receive and protect through its services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiff and the Class was the direct and primary objective of the contracting parties, and Plaintiff and Class Members were direct and express beneficiaries of such contracts.

164.    Defendant knew that if they were to breach these contracts with its clients, Plaintiff and the Class would be harmed.

165.    Defendant breached its contracts with its clients and, as a result, Plaintiff and Class Members were affected by this Data Breach when Defendant failed to use reasonable data security and/or business associate monitoring measures that could have prevented the Data Breach.

166.    As foreseen, Plaintiff and the Class were harmed by Defendant's failure to use reasonable data security measures to securely store and protect the files in its care, including but not limited to, the continuous and substantial risk of harm through the loss of their Private Information.

167.     Accordingly, Plaintiff and the Class are entitled to damages in an amount to be determined at trial, along with costs and attorneys' fees incurred in this action.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class against Defendants)**

184.     Plaintiff restates and incorporates by reference herein all the allegations contained in paragraphs 1 through 135.

168.     This count is brought in the alternative to Plaintiff's breach of implied contract count and breach of third-party beneficiary contract count.  If claims for breach of contract are ultimately successful, this count will be dismissed.

169.     Plaintiff and Class Members conferred a benefit on Defendants by way of patients providing Defendants with their personal information.

170.     The information provided to Defendants was supposed to be used by Defendants, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiff and Class Members.

171.     Defendants failed to provide reasonable security, safeguards, and protections to the personal information of Plaintiff and Class Members, and as a result Defendants were overpaid for their services.

172.     Under principles of equity and good conscience, Defendants should not be permitted to retain the money because Defendants failed to provide adequate safeguards and security measures to protect Plaintiff's and Class Members' personal information that they paid for but did not receive.

173.     Defendants wrongfully accepted and retained these benefits to the detriment of Plaintiff and Class Members.

174.    Defendant's enrichment at the expense of Plaintiff and Class Members is and was unjust.

175.    As a result of Defendants' wrongful conduct, as alleged above, Plaintiff and the Class are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendants, plus attorneys' fees, costs, and interest thereon.

**FIFTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

176.    Plaintiff restates and incorporates by reference herein all the allegations contained in paragraphs 1 through 135.

177.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, this Court is authorized to declare rights, status, and other legal relations, and such declarations shall have the force and effect of a final judgment or decree. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

178.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' Private Information and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their Private Information. Plaintiff alleges that Defendants' data security measures remain inadequate, contrary to Defendants' assertion that they has confirmed the security of its network. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of Private Information and remains at imminent risk that further compromises of Private Information will occur in the future.

179.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendants owe a legal duty to secure Private Information and to timely notify patients or any individuals impacted of a data breach under the common law, Section 5 of the FTC Act, HIPAA, various state statutes, and the common law; and

b.    Defendants continue to breach their legal duty by failing to employ reasonable measures to secure consumers' Private Information.

180.    This Court also should issue corresponding prospective injunctive relief requiring Defendants to, at minimum 1) disclose, expeditiously, the full nature of the Data Breach and the types of Private Information accessed, obtained, or exposed by the hackers; 2) implement improved data security practices to reasonably guard against future breaches of Plaintiff and Class Members' Private Information possessed by Defendant; and 3) provide, at its own expense, all impacted victims with lifetime identity theft protection services.

181.    If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendants. The risk of another such breach is real, immediate, and substantial. If another breach at Defendants occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

182.    The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

183.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendants, thus eliminating the additional injuries that would result to Plaintiff and Class Members whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all other similarly situated, prays for relief as follows:

a.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

c.    For compensatory, statutory, treble, and/or punitive damages in amounts to be determined by the trier of fact;

d.    For an order of restitution, disgorgement, and all other forms of equitable monetary relief;

e.    Declaratory and injunctive relief as described herein;

f.    Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

g.    Awarding pre- and post-judgment interest on any amounts awarded; and

h.    Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

A jury trial is demanded on all claims so triable.

Dated: June 10, 2024

Respectfully Submitted,

*/s/ Kenneth Grunfeld*
Kenneth Grunfeld (PA Bar No. 84121)
**KOPELOWITZ OSTROW P.A.**
65 Overhill Rd.
Bala Cynwyd, PA 19004
Telephone: 954-525-4100
grunfeld@kolawyers.com

J. Gerard Stranch, IV (*pro hac vice*
forthcoming)
**STRANCH, JENNINGS &**
**GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gstranch@stranchlaw.com

*Counsel for Plaintiff and the Proposed
Class*